## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

UNITED STATES OF AMERICA,      )
           )
        Plaintiff,     )
           )
        v.          )   Criminal No. 2011-16
           )
JEROME POTTER,  JAMES STEPHENS, EARL  )
SKELTON, and KASSAR J. CHITOLIE,    )
           )
        Defendants.    )
           )

ATTORNEYS:

**Ronald F. Sharpe, United States Attorney**
**Kim Lindquist, AUSA**
**Kelly B. Lake, AUSA**
**Delia L. Smith, AUSA**
United States Attorney's Office
St. Thomas, VI
    *For the plaintiff,*

**Daniel Louis Cevallos, Esq.**
Cevallos & Wong LLP
Philadelphia, Pa.
    *For the defendant Jerome Potter,*

**Francis E. Jackson, Jr., Esq.**
Law Offices of Francis Jackson
St. Thomas, U.S.V.I.
    *For the defendant James Stephens.*

**Rafael F. Muilenburg, Esq.**
Morrisette & Muilenburg
St. John, VI
    *For the defendant Earl Skelton,*

**Boyd L. Sprehn, Esq.**
Watts, Benham & Sprehn, P.C.
St. Thomas, VI
    *For the defendant Kassar J. Chitolie,*

## MEMORANDUM OPINION

**GÓMEZ, C.J.**

Before the Court are the several motions of the defendants
for judgments of acquittal or, in the alternative, for a new
trial.

## I.  PROCEDURAL HISTORY

On May 12, 2011, the grand jury returned an indictment (the
"Indictment") charging, among others, the defendants Jerome
Potter ("Potter"), James Stephens ("Stephens"), Earl Skelton
("Skelton"), and Kassar J. Chitolie, a/k/a Outcast ("Chitolie")
(collectively, the "Defendants"), with various counts stemming
from an illegal narcotics conspiracy centered on St. John,
United States Virgin Islands.

After a four-day trial, on April 5, 2012, the jury returned
a verdict of guilty against the defendants Potter, Stephens, and
Chitolie with respect to Count One of the Indictment, charging a
conspiracy to possess with the intent to distribute a controlled
substance. The jury further found Potter guilty of Count
Eighteen of the Indictment, charging him with the use of a
communication facility to commit a drug trafficking offense. The
jury likewise found Stephens guilty of Count Thirty-Eight of the
Indictment, charging him with the use of a communication
facility to commit a drug trafficking offense. The jury also
found Chitolie guilty of Counts Forty-Two and Forty-Three, both

charging him with use of a communication facility to commit a
drug trafficking offense. The jury further found Potter and
Skelton guilty of Counts Fifty-One and Fifty-Two of the
Indictment, charging both defendants with a separate conspiracy
to possess with the intent to distribute and use of a
communication facility to commit a drug trafficking offense,
respectively.

The Defendants now move for judgments of acquittal,
pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"),
or, in the alternative, for new trials, pursuant to Federal Rule
of Criminal Procedure 33 ("Rule 33"). The United States of
America (the "Government") opposes the motions.

## II.  <u>DISCUSSION</u>

### A. <u>Rule 29</u>

A defendant "challenging the sufficiency of the evidence
bears a heavy burden." *United States v. Casper*, 956 F.2d 416,
421 (3d Cir. 1992). A judgment of acquittal is appropriate under
Rule 29 only if, after reviewing the record in a light most
favorable to the prosecution, the Court determines that no
rational jury could find proof of guilt beyond a reasonable
doubt. *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006);
*see also United States v. Smith*, 294 F.3d 473, 476 (3d Cir.
2002) (district court must "'review the record in the light most
favorable to the prosecution to determine whether any rational

trier of fact could have found proof of guilt beyond a

reasonable doubt based on the available evidence.'" (quoting

*United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)).

An insufficiency finding should be " 'confined to cases

where the prosecution's failure is clear.' " *Smith*, 294 F.3d at

477 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir.

1984)). "Courts must be ever vigilant in the context of [Rule]

29 not to usurp the role of the jury by weighing credibility and

assigning weight to the evidence, or by substituting its

judgment for that of the jury." *United States v. Brodie*, 403

F.3d 123, 133 (3d Cir. 2005) (citations omitted); *see also*

*United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984)

("Our task is not to decide what we would conclude had we been

the finders of fact; instead, we are limited to determining

whether the conclusion chosen by the factfinders was

permissible.").

Further, the government may sustain its burden entirely

through circumstantial evidence. *Bobb*, 471 F.3d at 494; *see also*

*United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988).

**B.    Rule 33**

When deciding a Rule 33 motion for a new trial, the Court

is provided somewhat more discretion than what is afforded under

Rule 29. Under Rule 33, the Court may grant a new trial "in the

interest of justice." *United States v. Charles*, 949 F. Supp.

365, 368 (D.V.I. 1996). In assessing such "interest", the court

may weigh the evidence and credibility of witnesses. *United*

*States v. Bevans*, 728 F. Supp. 340, 343 (E.D. Pa. 1990), *aff'd*,

914 F.2d 244 (3d Cir. 1990). If the Court determines that there

has been a miscarriage of justice, the court may order a new

trial. *Id*. "The burden is on the defendant to show that a new

trial ought to be granted. Any error of sufficient magnitude to

require reversal on appeal is an adequate ground for granting a

new trial." *United States v. Clovis*, Crim. No. 1994-11 (TKM),

1996 WL 165011, at *2 (D.V.I. Feb. 12, 1996) (citing WRIGHT &

MILLER, FEDERAL PRACTICE & PROCEDURE: CRIMINAL § 551 (2d ed., 1982)).

### III. ANALYSIS

#### A. Rule 29

##### 1. Drug Trafficking Conspiracies

Potter, Stephens, and Chitolie challenge their convictions

under Count One of the Indictment, charging them with conspiracy

to possess with the intent to distribute a controlled substance.

Potter and Skelton likewise challenge their convictions under

Count Fifty-One of the Indictment, charging them with a separate

drug-trafficking conspiracy.

To sustain its burden of proof on a conspiracy charge, the

government must show: "(1) a unity of purpose between the

alleged conspirators; (2) an intent to achieve a common goal;

and (3) an agreement to work together toward that goal." *United*

*States v. Pressler,* 256 F.3d 144, 147 (3d Cir. 2001). The government must prove "that [the] defendant entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment." *United States v. Idowu*, 157 F.3d 265, 266-67 (3d Cir. 1998)(citation and internal quotation marks omitted); *see also United States v. Cartwright,* 359 F.3d 281, 286-87 (3d Cir. 2004).

The essence of any conspiracy is the agreement. *Pressler,* 256 F.3d at 147. Because agreements to commit crimes are clandestine by nature, direct evidence of criminal conspiracies is rare. *See id.* "The elements of a conspiracy may be proven entirely by circumstantial evidence, but each element of the offense must be proved beyond a reasonable doubt." *United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988). "Inferences from established facts are accepted methods of proof when no direct evidence is available so long as there exists a logical and convincing connection between the facts established and the conclusion inferred." *Idowu,* 157 F.3d at 269 (citation and quotations omitted). For example, a rational jury may find a conspiracy where the alleged co-conspirators: demonstrated a level of mutual trust; referred business to one another in exchange for discounts; frequently met to exchange large sums of money; consulted each other about drug prices; conducted their business in code; stood on lookout for each other; provided

protection to one another; shared packaging materials; shared

profits; or acted as debtor or creditor to one another. *See*

*Pressler,* 256 F.3d at 153-54; *United States v. Gibbs*, 190 F.3d

188, 200-02 (3d Cir. 1999); *United States v. Powell,* 113 F.3d

464, 467 (3d Cir. 1997); *United States v. McGlory,* 968 F.2d 309,

322-28 (3d Cir. 1992).

It is well-settled that "even in situations where the

defendant knew that he was engaged in illicit activity, and knew

that 'some form of contraband' was involved in the scheme in

which he was participating, the government is obliged to prove

beyond a reasonable doubt that the defendant had knowledge of

the particular illegal objective contemplated by the

conspiracy." *Idowu,* 157 F.3d at 266-67. Knowledge of the object

of a conspiracy may be established from inferences based on

circumstantial evidence, but a conspiracy conviction may not be

sustained by "inference as to the defendant's knowledge based

upon speculation." *Cartwright*, 359 F.3d at 287-88. The Third

Circuit "has consistently overturned convictions for conspiracy

in drug possession and distribution because of the absence of

any evidence that the defendant had knowledge that drugs were

involved." *Cartwright,* 359 F.3d at 287 (quoting *United States v.*

*Mastrangelo,* 172 F.3d 288, 293 (3d Cir. 1999)).

For example, in *United States v. Wexler,* 838 F.2d 88 (3d

Cir. 1988), the defendant drove in a manner suggesting he was

acting as a "lookout" for a truck containing drugs, spoke to a

co-conspirator several times during the transaction, and

signaled to a co-conspirator during the transaction. 838 F.3d at

91. Additionally, the police found a CB radio purchased using a

false name in the car the defendant was driving. *Id.* That

evidence was insufficient to show that the defendant knew that

the transaction involved controlled substances. As the Third

Circuit explained,

> It is likely that [the co-conspirator] would
> associate in the scheme only with persons he
> believed would not go to the police. It is
> also more likely than not that [the
> defendant] suspected, if not actually knew,
> that some form of contraband was involved in
> the elaborate secretive arrangements for
> transport in which he participated. But
> these permissible inferences do not support
> a holding that the government met its burden
> to prove beyond a reasonable doubt that [the
> defendant] knew this was a conspiracy to
> transport hashish or even another controlled
> substance. The evidence is just as
> consistent, for example, with a conspiracy
> to transport stolen goods, an entirely
> different crime.

*Wexler,* 838 F.2d at 92.

Thus, it is clear that merely behaving in a manner

consistent with realizing a criminal design is not sufficient.

Indeed, the Third Circuit has stated that "[t]he inferences

rising from 'keeping bad company' are not enough to convict a

defendant for conspiracy." *See Wexler,* 838 F.2d at 91 (quoting

*United States v. Cooper,* 567 F.2d 252, 255 (3d Cir. 1977)).

At the same time, the Third Circuit has also made it clear that considerable weight is to be given to a jury's reliance on a co-conspirator's identification of a defendant as a member of a conspiracy. For example, in *United States v. Claxton*, 685 F.3d 300 (3d Cir. 2012), Glenson Isaac ("Isaac"), a cooperating witness and admitted "main guy" in the drug-trafficking organization at the center of the case, stated that the defendant Craig Claxton ("Claxton") was a "member of the organization." The Third Circuit noted that Isaac's statement was not the admission of a coconspirator made during the course of a conspiracy, but rather an "admitted-conspirator's trial testimony regarding who was or was not his coconspirator . . . ." *Id.* at 309. The Third Circuit also recognized that the testimony was not as probative as a statement made by a coconspirator during and in furtherance of the conspiracy. *Id.* However, the Third Circuit found that Isaac's statement was "strong circumstantial evidence of Claxton's knowing involvement in [the] drug conspiracy." *Id.* at 310. The Third Circuit explained:

> [T]he fact that Claxton was identified as a member of a drug-trafficking organization by an admitted-conspirator, that he repeatedly did that organization's bidding, that he was entrusted to help transport large sums of money, that he visited the place where that money was laundered, and that he frequented the place where the organization's drugs were stored and its business discussed all

strongly suggest that he was aware of his
role in the conspiracy for which he was
prosecuted.

*Id.* at 312–13.

### i. Count One: Drug Trafficking Conspiracy Involving Potter, Stephens, and Chitolie

#### a. Potter

Potter argues that the evidence adduced at trial is insufficient to sustain his conviction for the offense charged in Count One of the Indictment.

At trial, the Government presented the testimony of Herbert Mason Ferguson ("Ferguson"), a cooperating witness and the professed head of the large drug-trafficking ring at the center of this case. Ferguson testified that he regularly purchased cocaine from Potter. Specifically, on at least three occasions, Ferguson purchased two-ounce quantities of cocaine from Potter for $500. (Tr. of Trial, Day 2, 140:15–24, Apr. 3, 2012, [hereinafter "Day 2 Tr."].)

On another occasion, in February of 2011, Ferguson was approached by an individual (later revealed to be a government informant) seeking to purchase twenty kilograms of cocaine. In response to this request, Ferguson called Potter "and asked him if he could help me purchase [it]." (Day 2 Tr. 187:1–2.) Potter explained that he would see about obtaining such a large

quantity of cocaine, and told Ferguson it would cost

approximately "$12,000 a kilo." (Day 2 Tr. 187:16–17.)

The Government also offered several recordings of telephone

conversations it intercepted between Ferguson and Potter. At

trial, Ferguson testified that in four of these conversations,

he and Potter were discussing their efforts to acquire the

twenty kilos of cocaine. For example, in one conversation,

Ferguson asked Potter about going to the Post Office. Ferguson

explained that he was asking about what types of stamps appeared

on the cocaine, as different stamps indicate differing levels of

quality. (Day 2 Tr. 188:24–189:1; 190:12–13.) Potter responded

by saying that "Everything's going to be blessed" and that

Ferguson shouldn't worry "because we have the baddest stuff."

(Gov't's Ex. 8a.) Ferguson explained that he understood this to

mean that the "20 keys [*sic*] of coke" were "good to go" and that

Potter "was going to get some high-quality stuff." (Day 2 Tr.

191:10–20.) Potter later returned Ferguson's call, and informed

him that a fish was stamped on the cocaine. (Day 2 Tr. 191:3–8.)

On a third call, Ferguson and Potter again discussed the

transaction. Ferguson told Potter "We all have to eat," by which

he meant "we all have to get a little cut from the transaction."

(Day 2 Tr. 192:20–23.) Ferguson explained that he intended to

make at least $1,000 in profit from the transaction. (Day 2 Tr.

192:24–193:1.)

Taken as a whole, this evidence tends to show that Potter
and Ferguson entered into an agreement that Potter would from
time to time supply Ferguson with cocaine, a controlled
substance. Moreover, the evidence shows that Potter entered into
this agreement knowing of its objective and intending for that
objective to be achieved. From this evidence, a rational jury
could reasonably conclude that Potter and Ferguson were engaged
in a conspiracy to possess with the intent to distribute a
controlled substance.

Nonetheless, Potter argues that his conviction should be
undone because he never explicitly referred to buying or selling
drugs in his several phone conversations with Ferguson.

In *United States v. Theodoropoulos*, 866 F.3d 587 (3d Cir.
1989), the Court of Appeals for the Third Circuit confronted a
similar issue. In that case, investigators intercepted various
calls between two of the several defendants, Athanasios
Theodoropolous ("Theodoropolous") and Nestor Barrera
("Barrera"). On one occasion, Theodoropolous called Barrera and
expressed a desire to purchase a television set. Barrera, who in
fact worked in an electronics store, offered to sell
Theodoropolous a television that was "a little bit over
fifteen." *Id.* at 593. A few days later, Theodoropolous called to
complain that his "client" was unhappy with the quality of the
television's picture. Barrera responded that he had better

quality televisions available. At trial, Barrera's employer
testified that he did not stock televisions that were "a little"
over fifteen inches. An FBI agent trained in cryptanalysis
further testified that the references to televisions were
references to drugs. The Third Circuit held that this evidence
was a sufficient basis from which the jury could infer that the
intercepted conversations were "related to a drug
transaction . . . ." *Id.*

Here, the evidence put before the jury at trial was not the
mere opinion of a cryptanalyst, but the testimony of one of the
members of the alleged conspiracy. Indeed, Ferguson testified at
great length and with considerable detail as to the precise
meaning of his and Potter's conversations. A jury could
reasonably infer from the recordings and Ferguson's testimony
that Potter and Ferguson were planning to acquire cocaine, even
in the absence of any express mention of illegal narcotics.
Accordingly, the Court will deny Potter's motion with respect to
Count One.

### b.  Stephens

Stephens likewise challenges the sufficiency of the
evidence with respect to his conviction of the offense charged
in Count One of the Indictment.

The evidence adduced against Stephens at trial consisted
primarily of the testimony of Ferguson and numerous recordings

of intercepted telephone calls. Ferguson regularly sold drugs to

Stephens, which Stephens in turn sold to others. In particular,

Ferguson testified that from February of 2011 up until May 6,

2011, he sold Stephens half-ounce portions of powder or crack

cocaine two or three times per week, at a price of $400 for each

half-ounce portion. (Day 2 Tr. 137:20-138:9.)

Stephens would typically request deliveries of drugs over

the phone. In recordings of these conversations, Stephens and

Ferguson appeared to be discussing various items of food.

However, Ferguson explained that this was merely a code for

discussing drugs:

> Q. . . . . There was a code word between you
> and Mr. Stephens regarding cocaine?
>
> A.   I didn't give him one at first, because
> I thought he knew better. But after a while
> I went and give him one.
>
> Q.   What was the code word?
>
> A.   Like the same thing as food. I would
> say, "Well, you need some food." "You need
> fish," anything, anything like that dealing
> with, dealing with food.
>
> . . . .
>
> [L]ike with fish, I would say, "Hey my wife
> cook. You need a plate of food?" and he
> understood what I meant.
>
> Q.   So "plate of food" means some kind of
> drug?
>
> A.   Cocaine. Not some kind of drug. Cocaine
> or crack.

(Tr. of Trial, Day 3, 131:3-20, Apr. 4, 2012 [hereinafter "Day 3 Tr."].)

The Government introduced eighteen recordings of intercepted conversations between Stephens and Ferguson, and Ferguson testified that all of them related to drug transactions. For example, on one occasion, Stephens called Ferguson and told him "I should have got a whole Z" because he was "done with that hard already." (Gov't's Ex. 56a.) Ferguson explained that "a whole Z" meant a whole ounce of crack cocaine. Ferguson also explained that by "done with that hard" Stephens meant that he had sold all of the crack cocaine he had previously purchased from Ferguson. (Day 2 Tr. 237:6-19.) Stephens then asked for a "one and one," which Ferguson testified meant "a half ounce of powder, a half ounce of crack." (Day 2 Tr. 237:20-25.) Stephens later called and told Ferguson, "I need a half, a hard, again," which Ferguson explained meant that Stephens needed another half-ounce of crack cocaine. (Day 2 Tr. 238:11-19.) Ferguson assented, but also told Stephens "I got to talk to you again when I come down there." (Gov't's Ex. 58a.) Ferguson explained that he wanted to talk to Stephens because

> he said the whole . . . transaction, he wants half a hard. And that was a little too blunt for me.
>
> So I wanted to talk to him and tell him he can't be using those kind of words on the

>           phone, because you never know . . . who is
>           listening.

(Day 2 Tr. 239:1-7.)

This evidence tends to show that Stephens and Ferguson

entered into an agreement that Potter would from time to time

supply Ferguson with cocaine, a controlled substance. Moreover,

the evidence shows that Stephens entered into this agreement

knowing of its objective and intending for that objective to be

achieved. From this evidence, a rational jury could reasonably

conclude that Stephens and Ferguson were engaged in a conspiracy

to possess with the intent to distribute a controlled substance.

Accordingly, the Court will deny Stephens' motion for a judgment

of acquittal.

### c.   Chitolie

Chitolie also challenges the sufficiency of the evidence

with respect to his conviction of the offense charged in Count

One of the Indictment.

As with Potter and Stephens, the evidence adduced against

Chitolie consisted primarily of the testimony of Ferguson and

the recordings of several intercepted telephone calls. Ferguson

stated that he knew "Mr. Chitolie, better known as Outcast."

(Day 2 Tr. 51:7-9.) Ferguson explained that Chitolie regularly

supplied him with marijuana. Ferguson and Chitolie discussed

several of these drug transactions over the phone. For example,

in one instance Ferguson called Chitolie and Chitolie stated that he had "Popcorn and Reggie." (Gov't's Ex. 102a.) Ferguson explained that " 'Popcorn' mean the pop weed, the high-grade weed, and 'Reggie' mean regular weed." Ferguson agreed to buy a quarter-pound of "reggie" marijuana for $450. (Day 2 Tr. 249:21– 250:4.) On another occasion, Ferguson called Chitolie to purchase a quarter-pound of marijuana. During this call, he asked Chitolie "[i]s there a green Christmas tree, right [*sic*]?" to which Chitolie said there was. (Gov't's Ex. 103a.) Ferguson explained that by this he meant "[i]f it's green and not brown." (Day 2 Tr. 250:16-25.) In yet another call, Chitolie told Ferguson that "[h]e got a big pool game them [*sic*], you understand?" (Gov't's Ex. 96a.) Ferguson explained that this meant Chitolie had "an eighth of cocaine waiting on me." Ferguson agreed to pay $2200 for the quantity of cocaine. (Day 2 Tr. 248:5-19.)

This evidence tends to show that Chitolie and Ferguson entered into an agreement that Chitolie would from time to time supply Ferguson with marijuana and other controlled substances. Moreover, the evidence shows that Chitolie entered into this agreement knowing of its objective and intending for that objective to be achieved. From this evidence, a rational jury could reasonably conclude that Chitolie and Ferguson were

engaged in a conspiracy to possess with the intent to distribute

a controlled substance.

Nonetheless, Chitolie argues that his conviction should be

overturned because he was never identified by his real name on

the Indictment, but only by his alias, "Outcast." In general,

the use of aliases to identify a defendant is discouraged. *See*

*United States v. Beedle*, 463 F.2d 721, 725 (3d Cir. 1972) ("The

practice of allowing aliases to exist has been condemned

where . . . they serve no useful purpose either to identify the

accused or protect him from double jeopardy.") However, "an

alias in an indictment, even one with strong negative

connotations, is permissible if it is needed to connect the

accused to the acts charged." *United States v. Vastold*, 899 F.2d

211, 232 (3d Cir.), *rev'd on other grounds*, 497 U.S. 1001

(1990). In such circumstances, "the government normally has been

required to prove that the defendant was known by the alleged

alias." *Id.*

For example, in *United States v. Brown*, 54 F. App'x 342 (3d

Cir. 2002), a police officer testified that he was able to

identify the defendant, who he knew as "Tyree Brown," when he

saw that name listed as an alias of "Andrew Brown," the

defendant's actual name. The defendant objected on the ground

that the reference to an alias improperly suggested to the jury

that he had a prior conviction. The Third Circuit disagreed,

explaining, "The answer . . . was an evidentiary statement as to how [the police officer] discovered Brown's true identity as was essential to identifying how the investigation was completed." *Id.* at 344. The court thus held that the defendant's right to a fair trial was not violated.

In the present case, Ferguson testified that he knew of Chitolie as "Outcast" and referred to him almost exclusively by that name during the course of his testimony. Ferguson also specifically identified in Court, and described the appearance of, Chitolie. (Day 2 Tr. 51:7–18.) In making that identification, Ferguson referred to Chitolie as "Outcast." (Day 2 Tr. 51:7–9.) Thus, Chitolie's argument that the evidence introduced against "Outcast" could not be imputed to him falls flat. Moreover, Chitolie has not identified, and the Court cannot conceive of, any prejudice that he might have suffered as a result of being referred to by this alias. While it may not have the most pleasant connotations, the name "Outcast," on its own, does not imply complicity in any crime charged. There was also no suggestion Chitolie was referred to by this alias because of a prior conviction or as a result of some other nefarious purpose. *Compare Brown*, 54 F. App'x at 344. The Court thus finds no reason to disturb Chitolie's conviction.

### ii. Count Fifty-One: Drug Trafficking Conspiracy Involving Potter and Skelton

#### a. Potter

Potter also challenges the sufficiency of the evidence with respect to his conviction for the offense charged in Count Fifty-One of the Indictment.

At trial, Ferguson testified that in April of 2011, he, Potter, and two others who were later revealed to be police informants, "got together and we was conspiring to air drop 300 kilos of cocaine on the east end of Coral Bay [St. John]." (Day 2 Tr. 53:13-14.) In particular, on April 28, 2011, the four men met on St. John to discuss the particulars of this transaction. At this meeting, one of the government informants stated that he was looking for "some guys who could work on boats to pick up 300 kilos of cocaine." (Day 2 Tr. 195:2-3.) They chose to schedule the drop around May 6, 2011, when the police would be preoccupied with the Carnival celebrations in St. Thomas, at approximately 4:00 a.m. in the morning. (Day 2 Tr. 195:1-18.)

Ferguson also negotiated the terms of the deal, explaining that he and Potter wanted ten percent of the total amount of cocaine, or thirty kilos. He expected to ultimately make $30,000 off of the transaction. (Day 2 Tr. 195:24-196:13.)

Ferguson explained that Potter's role would be to take his boat out into the ocean near St. John and meet up with one of

the two undercover informants. There, the informant would signal

to an aircraft, which would drop the drugs into the water.

Potter would then recover the drugs and take them ashore on St.

John. Ferguson would then meet Potter once Potter came ashore,

take their cut from the total 300 kilograms, and then deliver

the remainder. (Day 2 Tr. 206:21–207:24; 211:25–212:2.)

On May 6, 2011, the night of the supposed air drop, Potter

was arrested in his boat off the coast of St. John. Skelton was

also present in the boat and likewise arrested.

Taken as a whole, this evidence is sufficient to show that

Potter and Ferguson entered into an agreement to acquire 300

kilograms of cocaine, with the intent to distribute it, and with

full knowledge that this was the objective of the agreement and

the joint purpose to achieve that objective. Thus, a rational

jury could reasonably have concluded that Potter was guilty of a

conspiracy to possess with the intent to distribute a controlled

substance.

### b. Skelton

Skelton also challenges the sufficiency of the evidence

with respect to his conviction for the offense charged in Count

Fifty-One of the Indictment.

At trial, the evidence adduced with respect to Skelton

consisted primarily of his presence on Potter's boat on the

night of the May 6, 2011, sting operation, as well as the

recordings of several intercepted phone conversations between Skelton, Potter, and third parties.

On March 10, 2011, Potter called Skelton regarding a debt Skelton owed. Skelton stated, "Boy I trying my best to geh this money from this man, the man tell me he . . . ain geh the money up to yet. But I try to come up with the money myself and I going geh you, trying gee you bout eight thousand dollars." (Gov't's Ex. 65a.) Thereafter, Potter called an unidentified individual and said "Them man tell me . . . give me eight thousand dollars of their own personal money and work on . . . right now, until he geh the rest of it from the dude. . . . When I come back, I'll give you a deposit, alright?" (Gov't's Ex. 66a.)

On another occasion, Potter received a call from an unidentified individual, asking where Potter got some "t-shirts":

> [UNIDENTIFIED]:     Alright, who, . . . you had geh um, tha vibes from[?]
>
> POTTER:  Is a dude name . . . Earl. Tall, tall dude name Earl!
>
>            . . . .
>
> [UNIDENTIFIED]:     Nah me ain know he.
>
> POTTER:  He name Earl I don't know. Tell me about them. I mean, he was selling me about it. Bout Thirty-Six of them t-shirts.

(Gov't's Ex. 70a.) Potter later called another unidentified

individual and complained about the quality of his t-shirts:

> POTTER:  It look like somebody just give
> that t-shirt deh, knowing that it ain
> worth . . . nothing.
>
> . . . .
>
> [The t-shirts] look perfect. . . .
>
> [UNIDENTIFIED]:    But if you smell it
> right, it smell different[.]
>
> POTTER:  I doing everything . . . suppose
> to do, because I check all of that . . .
> deh[.]
>
> . . . .
>
> I even put deh . . . girl in my mouth.

(Gov't's Ex. 71a.)

Shortly before the supposed air drop, Potter called another

unidentified individual and stated that "I have some good work

coming up. Everything is for a person. I got two good persons. I

working with them to come through, you check." (Gov't's Ex.

85a.)

To begin, it is well-settled that "even in situations where

the defendant knew that he was engaged in illicit activity, and

knew that 'some form of contraband' was involved in the scheme

in which he was participating, the government is obliged to

prove beyond a reasonable doubt that the defendant had knowledge

of the particular illegal objective contemplated by the

conspiracy." *Idowu,* 157 F.3d at 266-67. "The inferences rising

from 'keeping bad company' are not enough to convict a defendant

for conspiracy." *See Wexler,* 838 F.2d at 91 (quoting *United*

*States v. Cooper,* 567 F.2d 252, 255 (3d Cir. 1977)).

In *United States v. Salmon,* 944 F.2d 1106 (3d Cir. 1991),

the defendant drove his car to the scene of a drug transaction

with other co-conspirators, performed surveillance, and spoke to

co-conspirators during a drug transaction. 944 F.2d at 1114. He

also opened the trunk of the car in the parking lot where the

drug deal occurred, and a co-conspirator walked to the trunk

area before performing the transaction. *Id.* The Third Circuit

held that the above evidence was insufficient to prove that the

defendant had the specific knowledge required to support a

conspiracy conviction. *Id* at 1115. The court reasoned that,

"even assuming, *arguendo*, that the cocaine was in the trunk, the

record contains no evidence that [the defendant] knew that the

bag contained a controlled substance such as cocaine as opposed

to anything else." Id.

In *United States v. Idowu,* 157 F.3d 265 (3d Cir. 1998), the

defendant, Ismoila Idowu ("Idowu"), was convicted of conspiracy

to possess with intent to distribute more than one kilogram of

heroin. Idowu's codefendant, Monadu Ajao ("Ajao") negotiated the

purchase of a quantity of heroin with an undercover government

informant. "Throughout the . . . negotiations, Ajao never

mentioned Idowu . . . ." 157 F.3d at 266.

Ajao arranged to meet the informant in a parking lot. On

the date of the meeting, Idowu drove Ajao to the parking lot.

Idowu and Ajao got out of the car and entered a nearby motel

lobby. Together they returned, with Idowu carrying a brown bag.

The informant then arrived. When the informant inquired as

to who Idowu was, Ajao responded "he is the driver."

Idowu then opened the trunk, and inside was the brown bag.

Idowu opened the bag, showing the informant the money inside. As

the informant counted the money Idowu noted that "he had checked

the money himself, and that all $20,000 was there." *Idowu*, 157

F.3d at 267. The informant then took the brown bag and in return

gave Ajao and Idowu a black suitcase. Idowu opened the black

suitcase and observing nothing inside, told Ajao, "They didn't

pack this thing." Ajao told Idowu to push the suitcase with his

hands, and the informant attempted to convince the men that

something was hidden in the suitcase frame. Ajao and Idowu were

arrested shortly thereafter.

Based on that evidence, the Third Circuit concluded that

"only two inferences are proper: that [the defendant] had some

kind of preexisting relationship with [the co-conspirator], and

that [the defendant] knew he was participating in some sort of

illegal transaction." *Id.* The evidence failed to support the

critical inference that the defendant "knew the transaction was

a drug transaction." *Id.* The court reasoned that none of the

participants referred to the subject of the transaction as

"heroin" or "drugs" in the defendant's presence, but rather

referred to "the stuff." *Id.* Additionally, the defendant did not

take part in any of the recorded telephone conversations leading

up to the transaction in question. *Id.* Accordingly, the court

held that "it [wa]s unreasonable for a jury to infer that [the

defendant] knew of the transaction's ultimate purpose." *Id.* at

269.

In *United States v. Rodriquez-Valdez*, 209 F. App'x 178 (3d

Cir. 2006), the defendant was present on a boat that was linked

to a second vessel on which 498.5 kilograms of cocaine was

found. 209 F. App'x at 179. He was charged with conspiracy to

possess with intent to distribute cocaine. During the trial, a

cooperating witness testified that he had participated in an

operation to smuggle drugs from St. Maarten to St. Thomas using

the seized vessels. The cooperating witness noted that prior to

the transport of the drugs, he stayed in a hotel in St. Thomas,

and met with several of the participants in the drug smuggling

effort. The cooperating witness stated that Valdez was "'a

constant help,'" but, "there was no testimony from [the

cooperating witness] or law enforcement authorities that drugs

were ever discussed while Valdez was present at the hotel, or

that he spent much time at the hotel during [the cooperating witness'] ten-day stay." *Id.* at 180-81.

The Third Circuit found that there was insufficient evidence that Valdez was necessarily exposed to the object of the conspiracy during this time. It reasoned that, though Valdez's presence on the boat may have been suggestive of knowledge of illicit activity, his presence "[wa]s . . . too slender a reed upon which to base a finding that he was aware of the object of the conspiracy." *Id.* at 181.

This line of cases stands for the proposition that a verdict cannot be sustained merely upon proof that the defendant was up to no good. Put differently, merely behaving in a manner consistent with realizing a criminal design is not sufficient absent some evidence of knowledge of, and agreement with, the precise objectives of the conspiracy.

At the same time, direct evidence of a conspirator's involvement--such as by identification by a fellow coconspirator--carries substantial weight. *See Claxton*, 685 F.3d at 312-13. In *Claxton*, as discussed above, proof of a defendant's relationship with other members of the conspiracy, presence at the scenes of their various dealings, and other suspicious behavior, when combined with a coconspirator's testimony implicating the defendant, was sufficient to sustain a conviction.

In the present case, however, there is scant evidence of the sort adduced in *Claxton* that might identify Skelton as a member of the conspiracy. For example, Claxton routinely was tasked with shepherding large sums of money. There is no record evidence that Skelton had any such responsibility in furtherance of the conspiracy here. Moreover, and perhaps most significantly, there was no identification of Skelton as a partner in the conspiracy. Indeed, Ferguson testified that the first time he met Skelton was in prison. (Day 2 Tr. 49:23-25.) No one else involved in the conspiracy testified that Skelton had any involvement whatsoever.

The Government relies heavily on the several recorded phone conversations between Potter, Skelton, and others, involving a debt of some $8,000 and the discussion of certain "t-shirts," given or sold to Potter by Skelton. The Government argues that the jury could have reasonably inferred that "t-shirts" was code for some sort of illegal narcotics.

The Third Circuit confronted a similar issue in *United States v. McGlory*, 968 F.2d 309 (1992). In that case, an informant testified that he contacted one of the defendants, Melvin Hauser ("Hauser"), and asked if he could purchase some heroin. Shortly thereafter, the police intercepted a telephone call between Hauser and one of his codefendants, Reginald McGlory ("McGlory"). Hauser asked McGlory if he still had some

"slippers," to which McGlory replied in the affirmative. *Id.* at

322.

Not long after the phone call was concluded, the police

observed Hauser arrive at McGlory's residence carrying a box. A

few minutes later, police saw Hauser leave, without the box. The

police also saw Hauser stuffing something white into the

waistband of his jogging suit. *Id.* After returning home, Hauser

received a call from McGlory. McGlory asked, "that was 44,

right?" Hauser replied that it was 44. Later that same day,

Hauser sold an eighth of an ounce of heroin. *Id.* at 322-23.

Although noting it was a close question, the Third Circuit

found this evidence sufficient to support Hauser's conviction

for conspiracy to distribute heroin. The Court noted that

although no single act of Hauser and McGlory suggested a drug

transaction, taken as a whole, "the activities of the

participants . . . could not have been carried on except as the

result of a preconceived scheme or common understanding." *Id.*

(quoting *United States v. Knapp*, 781 F.2d 1008, 1010 (3d Cir.

1986) (quoting *United States v. Ellis,* 595 F.2d 154, 160 (3d

Cir. 1979))) (internal quotation marks omitted). In particular,

the Court noted that its conclusion was bolstered by Hauser and

McGlory's "guarded conversations" and by the fact that Hauser

subsequently sold heroin to an informant later that same day.

*Id.* at 324.

Here, the jury was not presented with the sort of corroborative circumstantial evidence present in *McGlory*. Indeed, no witness could confirm that Skelton and Potter had done anything other than talk on the phone. There certainly was no witness who could explain the meaning of the phrase "t-shirts" as it was used between Skelton and Potter.

Even assuming the jury could permissibly infer that "t-shirts" was a coded reference to contraband, this alone would be insufficient to sustain Skelton's conviction. There is nothing in the record that could conceivably suggest what narcotics Skelton and Potter were discussing. The fact that any numbers were mentioned is unhelpful, at best, without some associated unit of measurement. Moreover, the record is devoid of any evidence that suggests "t-shirts" was intended to refer to drugs as opposed to some other sort of contraband. Potter could have been referring to illegally obtained fish, for example.

Lastly, Potter's statements that he had some "good work coming up" and that he was working with "two good guys" are ambiguous, at best. Aside from the temporal proximity to the air drop, there is nothing remotely criminal about those statements. Even if there were, there is nothing in the record to link those statements to Skelton.

The Court thus finds that, based on this evidence, no jury could reasonably conclude that Skelton was guilty of conspiracy

to distribute cocaine. Accordingly, the Court will grant

Skelton's motion for a judgment of acquittal.

## 2. Use of Communication Facilities

### i. Potter

Potter challenges the sufficiency of the evidence with

respect to his conviction for the offenses charged in Counts

Eighteen and Fifty-Two.

For a defendant to be convicted of the use of a

communication facility to commit or facilitate the commission of

a drug trafficking offense, the Government must prove (1) that

the defendant knowingly used a communication facility; and (2)

that the defendant used the communication facility with the

intent to commit or facilitate the commission of a drug

trafficking offense. 18 U.S.C. § 843(b); *see also United States*

*v. Pierorazio*, 578 F.2d 48, 51 (3d Cir. 1978). A communication

facility includes "any and all public and private

instrumentalities used or useful in the transmission of writing,

signs, signals, pictures, or sounds of all kinds and

includes . . . telephone . . . communication." 18 U.S.C.

§ 843(b).

In Count Eighteen, the Indictment charges that Potter used

a communication facility to commit or facilitate the commission

of the cocaine distribution conspiracy charged in Count One. As

discussed above, the evidence adduced at trial showed that on

several occasions, Potter used a telephone to talk to Ferguson about the acquisition of twenty kilograms of cocaine. In these calls, Potter and Ferguson discussed various details of the transaction, such as its time and the price of the cocaine.

From this evidence, a rational jury could reasonably conclude that Potter knowingly used a telephone to facilitate the commission of the drug distribution conspiracy charged in Count One. Accordingly, the Court will deny Potter's motion for a judgment of acquittal with respect to Count Eighteen.

In Count Fifty-Two, the Indictment charges Potter with using a communication facility to facilitate the commission of the cocaine distribution conspiracy charged in Count Fifty-One. The evidence adduced at trial showed that on the night of the supposed air drop, Potter called Ferguson several times. In three of these conversations, Potter called from his boat while in the water off the coast of St. John. Potter repeatedly asked where he could find the informant he was supposed to meet prior to the air drop. (Day 2 Tr. 210:25–212:2.)

From this evidence, a rational jury could reasonably conclude that Potter used a telephone to facilitate the commission of the drug distribution conspiracy charged in Count Fifty-One. Accordingly, the Court will deny Potter's motion for a judgment of acquittal with respect to Count Fifty-One.

### ii.   Stephens

Stephens challenges the sufficiency of the evidence with respect to his conviction for the offense charged in Count Thirty-Eight of the Indictment, namely, that he used a telephone to facilitate the commission of a drug crime.

As discussed above, the Government produced evidence of eighteen phone calls made between Stephens and Ferguson. These calls typically consisted of Stephens calling Ferguson to request either crack or powder cocaine, which Stephens in turn sold to his various customers. From this evidence, a rational jury could reasonably conclude that Stephens used a telephone to facilitate the commission of the drug-distribution conspiracy charged in Count One of the Indictment.

### iii. Chitolie

Chitolie challenges the sufficiency of the evidence with respect to his conviction for the offense charged in Counts Forty-Two and Forty-Three of the Indictment, namely, that he used a telephone to facilitate the commission of a drug crime.

Count Forty-Two charges that, on or about April 23, 2011, Chitolie used a telephone to facilitate the commission of a conspiracy to distribute marijuana. Count Forty-Three charges that later on that same day, Chitolie again used a telephone to facilitate the commission of a marijuana-distribution conspiracy.

At as discussed above, Ferguson testified that in April of 2011, he called Chitolie to talk about purchasing a quarter pound of "reggie" marijuana for $450. During the course of that conversation, Ferguson told Chitolie that his son would pick up the drugs from Chitolie. Later that same day, he again spoke to Chitolie to make sure the marijuana was green like a "Christmas tree." (Day 2 Tr. 249:19–251:5.)

From this evidence a rational jury could reasonably conclude that on two separate occasions on or about April 23, 2011, Chitolie used a telephone to facilitate the commission of a drug-distribution conspiracy. Accordingly, the Court will deny Chitolie's motion for a judgment of acquittal with respect to Counts Forty-Two and Forty-Three.

### iv.  Skelton

Skelton challenges his conviction for the use of a communication facility to facilitate the commission of a drug trafficking offense. In order to sustain a conviction for the crime of using a communication facility to facilitate a drug trafficking offense, the evidence must be sufficient to show that the underlying drug-trafficking offense was in fact committed. *See Pierorazio*, 578 F.2d 48, 51 (3d Cir. 1978). Here, as discussed above, there is not sufficient evidence to implicate Skelton in a drug-distribution conspiracy, or any other drug-trafficking offense. The evidence is therefore

likewise insufficient to sustain his conviction under Count

Fifty-Two. Accordingly, Skelton's motion for a judgment of

acquittal will be granted.

**B.    Rule 33**

### 1.    Right of Confrontation

The Defendants argue that their rights of confrontation

were violated by the Court's limitation of their cross-

examination of Ferguson, and that they are therefore entitled to

a new trial.

The Confrontation Clause of the Sixth Amendment guarantees

the right of an accused in a criminal prosecution "to be

confronted with the witnesses against him." U.S. CONST. amend. VI.

The right of confrontation "means more than being allowed to

confront the witness physically." *Davis v. Alaska*, 415 U.S. 308,

315 (1974). Indeed, " '[t]he main and essential purpose of

confrontation is to secure the opponent for the opportunity of

cross-examination.' " *Id.* at 315-16. In particular the Supreme

Court has recognized that "the exposure of a witness' motivation

in testifying is a proper and important function of the

constitutionally protected right of cross-examination." *Id.* at

316-17.

" 'Whether a trial court has abused its discretion in

limiting the cross-examination of a witness for bias depends on

"whether the jury had sufficient other motivation before it,

without the excluded evidence, to make a discriminating

appraisal of the possible biases and motivation of the

witnesses." ' " *United States v. Chandler*, 326 F.3d 210, 219 (3d

Cir. 2003) (quoting *Brown v. Powell*, 975 F.2d 1, 4 (1st Cir.

1992) (quoting *United States v. Tracey*, 675 F.2d 433, 437 (1st

Cir. 1982))). The Third Circuit has made it clear that

> With respect to the cross-examination of
> cooperating witnesses who expect to obtain,
> or have obtained, a benefit form the
> government in exchange for their testimony,
> the "critical question is whether the
> defendant is allowed an opportunity to
> examine a witness [sic] 'subjective
> understanding of his bargaining with the
> government,' 'for it is this understanding
> which is of probative value on the issue of
> bias.' "

*Chandler*, 326 F.3d at 220 (quoting *United States v. Ambers*, 85

F.3d 173, 176 (4th Cir. 1996) (quoting *Hoover v. Maryland*, 714

F.2d 301, 305, 306 (4th Cir. 1983))).

In the present case, the Court permitted the Defendants to

cross-examine Ferguson about each count of conviction pursuant

to his guilty plea. The Court also permitted the defendants to

cross-examine Ferguson about the fact that, prior to his

agreement to cooperate, he was facing a substantial period of

incarceration. The Defendants also cross-examined Ferguson about

the terms of his agreement with the Government, including the

fact that he anticipated some leniency on their part. (Day 3 Tr.

70:4–79:4.)

The only limitation the Court imposed in this regard
pertained to attempts by the Defendants to elicit testimony
regarding the precise level of exposure Ferguson was facing.
That limitation appears consistent with authority from The Third
Circuit, which has made it clear that the right to question a
cooperating witness regarding potential bias does not entail "a
categorical right to inquire into the penalty a cooperating
witness would otherwise have received." *United States v.
Mussare*, 405 F.3d 161, 170 (3d Cir. 2005). Indeed, the operative
inquiry is "whether the magnitude of reduction would likely have
changed the jury's mind regarding [the witness's] motive for
testifying." *Id.* Thus, for example, the Third Circuit has held
that it was not error to limit cross-examination regarding the
penalty faced by a cooperating witness when there was "extensive
testimony regarding the plea bargain," even when as a result of
the bargain, the witness would receive no jail time. *Id.* Here,
Ferguson was extensively questioned about the details of his
plea bargain, including the fact that he hoped for a reduction
in what would otherwise have likely been a substantial sentence.
Given the cross-examination that was permitted, the Court cannot
discern what, if any effect disclosure of the precise penalty
Ferguson would have faced might have had on the jury.

Ferguson was also permitted to testify that his wife and
son were charged in the drug-distribution conspiracy and whether

their sentences would be affected by his cooperation. Ferguson

also testified that despite being arrested as members of the

drug-distribution conspiracy, his wife and son were both

currently not incarcerated. (Day 3 Tr. 105:4–107:5.)

The Defendants nonetheless argue that they should have been

permitted to offer into evidence the plea agreements entered

into between the Government and Ferguson's wife and son. At

trial, the Government objected to the admission of these

documents on the ground that they were hearsay, that the witness

through whom the Defendants sought to introduce these documents-

-Ferguson--lacked personal knowledge of their contents, and that

these documents were ultimately irrelevant as neither Ferguson's

wife nor his son testified at trial. The Defendants do not

challenge these objections but merely contend that their rights

of confrontation ought to usurp them. The Court is unaware of,

and the Defendants have not identified, any authority for the

proposition that the right of confrontation can transform an

inadmissible document into an admissible one, merely because it

might possibly bear on a witness's motive for testifying. The

Court is thus unpersuaded that the Defendants confrontation

rights were violated.

### 2.  Charging Separate Conspiracies and Single Conspiracy

The Defendants also argue that their rights to a fair trial

were violated because the Government charged a single conspiracy

in Count One of the Indictment, when in fact there were three separate conspiracies.

The crux of the Defendants' argument is that the Government charged a hub-and-spokes conspiracy but failed to prove the existence of a hub connecting the spokes. That is, they claim Ferguson was the hub, and entered into agreements with three unconnected spokes--Potter, Stephens, and Chitolie.

"A conviction must be vacated when (1) there is a variance between the indictment and the proof presented at trial and (2) the variance prejudices a substantial right of the defendant." *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1989) If an indictment charges a single conspiracy, yet the proof adduced at trial shows "multiple unrelated conspiracies," an impermissible variance has occurred and the defendants' convictions cannot stand. *United States v. Kemp*, 500 F.3d 257, 288 (3d Cir. 2007) (quoting *United States v. Kenny*, 462 F.2d 1205, 1216 (3d Cir. 1972)); *see also Kotteakos v. United States*, 328 U.S. 750, 752–53 (1946). However, the government may permissibly charge a "master conspiracy [with] more than one subsidiary scheme." *Kenny*, 462 F.2d at 1216; *see also United States v. Chandler*, 388 F.3d 796, 811 (11th Cir. 2004) (stating that "although each of these alleged spoke conspiracies had the same goal, there was no evidence that this was a *common* goal" (emphasis original)).

However, even if there is an impermissible variance, a defendant's conviction must be overturned only if that variance prejudiced that defendant's substantial rights. *Kemp*, 500 F.3d at 291; *United States v. Padilla*, 982 F.2d 110, 115 (3d Cir. 1992) (stating "assuming arguendo that Padilla has demonstrated a variance, he must also show prejudice to a substantial right"). The Third Circuit has identified three underlying purposes of the rule against variances which are informative in assessing whether a defendant has been prejudiced. First, "the rule protects the right of each defendant 'not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others.' " *United States v. Schurr*, 775 F.2d 549, 553 (3d Cir. 1985) (quoting *Kotteakos*, 328 U.S. at 775) (emphasis original). That is, the jury should not be permitted to transfer " 'guilt from one alleged co-schemer to another.' " *United States v. Perez*, 280 F.3d 318, 346 (3d Cir. 2002) (quoting *United States v. Barr*, 963 F.2d 641, 648 (3d Cir. 1992)). Courts have also expressed parallel concerns about the possibility of evidence spillover. *See United States v. Trainor*, 477 F.3d 24, 36 n.21 (1st Cir. 2007) (stating that "the spillover concern is addressed to whether incriminating evidence against co-defendants who were involved in separate conspiracies affected the jury's consideration of the evidence against the defendant"). "Second, the rule ensures that a defendant has

adequate notice of the charges being brought against him." *Kemp*,

500 F.3d at 291 (citing *Perez*, 280 F.3d at 345). Third, the rule

"rests on a principle akin to double jeopardy, for the rule

helps to minimize the danger that the defendant may be

prosecuted a second time for the same offense." *Schurr*, 775 F.2d

at 554 (internal quotation marks omitted).

In *United States v. Kemp*, 500 F.3d 257 (3d Cir. 2007), the

Third Circuit considered whether charging three conspiracies as

a single one prejudiced the defendants. In that case, five

individuals, Corey Kemp ("Kemp"), Glenn G. Holck ("Holck"),

Stephen M. Umbrell ("Umbrell"), and Ronald White ("White"), were

charged with conspiracy to commit honest services fraud. Kemp

was the former treasurer of Philadelphia. The other defendants

were various local businesspeople. The Third Circuit found that

there were in fact three separate conspiracies: first, a

conspiracy between White and Kemp, in which White showered Kemp

with gifts in order to receive favorite treatment for certain

companies. Among these companies was the bank at which Holck and

Umbrell worked. Second, Holck and Umbrell extended various loans

to Kemp and otherwise treated him favorably in exchange for

influencing his decision-making. Third, White and Kemp also

entered into a conspiracy with another businessman, in which

White similarly used his power over Kempt to obtain favorable

treatment for the businessman, and in exchange, Kemp received

various kickbacks.

Holck and Umbrell argued that they were prejudiced because

the jury was presented with a great deal of evidence concerning

the seamy and transparent bribery of Kemp by White. The Third

Circuit rejected this contention for three reasons. First, the

court noted that such evidence was admissible against Holck and

Umbrell because "evidence concerning White and Kemp's

relationship was relevant to Holck and Umbrell to explain

White's power over Kemp, which worked in Holck and Umbrell's

favor." *Id.* at 292.

Second, the Court noted that the government "rigorously

segmented its proofs and never suggested in any way that any

piece of evidence related to [the third conspiracy] was relevant

to establish Holck and Umbrell's participation in the

conspiracy." *Id.* The Court noted that the likelihood of

prejudice is diminished when " 'the presentation against the

defendants . . . proceed[s] seriatim.' " *Id.* (quoting *Padilla*,

982 F.2d at 116).

Third, the Court held that "the danger of prejudice

increases along with the number of conspiracies that make up the

wrongly charged single conspiracy." The Court noted that the

conspiracy at issue involved only five conspirators in three

distinct conspiracies. The court thus distinguished *Kotteakos v.*

*United States*, 328 U.S. 750 (1946), in which the Supreme Court

struck down a conviction when the proof at trial showed not one

conspiracy, but eight separate conspiracies involving between

thirteen and thirty-two individuals. *Id.* at 752-53; *see also id.*

at 766 (distinguishing *Berger v. United States*, 295 U.S. 78

(1935), where the Supreme Court upheld a conviction when the

proof at trial showed only two conspiracies rather than one, and

involved only four conspirators).

Because a finding of prejudice would, in any event, be

necessary to overturn the Defendants' convictions, the Court

will first address this aspect of the impermissible-variance

analysis. The Defendants argue that they were prejudiced because

the evidence pertaining to one of them may have spilled over

onto the others.

Significantly, however, as in *Kemp*, each of the Defendants

entered into a conspiracy with Ferguson to distribute various

drugs. "Under the law of conspiracy, a defendant is liable for

his own and his co-conspirators' acts for as long as the

conspiracy continues." *United States v. Kushner*, 305 F.3d 193,

198 (3d Cir. 2002). In particular, the Third Circuit has held

that evidence about how a drug-trafficking organization is

supplied is relevant as against downstream distributors. *See*

*Perez*, 280 F.3d at 347 (affirming the admission of evidence

about suppliers as against drug dealers, even though there was a

middleman between them, because "[the dealers] depended on a
scheme involving [the smuggler and the middleman] and the
shipment from the Philippines to possess and distributed the
illegal drug"); *See also United States v. Portela*, 167 F.3d 687,
697 (1st Cir. 1999) (explaining that similar evidence was
admissible when "the continued health of the trafficking and
distribution network necessarily depends on the continued
efforts of multiple suppliers").

Thus, evidence about how Ferguson obtained the drugs he
sold to Stephens is relevant to show how Ferguson's drug-
distribution organization operated. Moreover, Ferguson's ability
to obtain drugs worked to Stephens benefit, as Stephens had a
steady supply of drugs to sell to his customers. Likewise,
evidence about how Ferguson distributed drugs is relevant as
against Potter and Chitolie, who supplied those drugs.
Ferguson's ability to sell these drugs to others benefited
Potter and Chitolie as he was able to pay them substantial sums
over the course of several interactions.

Additionally, although the Government's case did not
proceed strictly in seriatim, its proof was rigidly segmented.
Notably, Ferguson testified to each defendant in turn. With each
defendant, Ferguson identified specific transactions, phone
calls, and other interactions. The Government avoided eliciting
any general testimony about all the Defendants. Although the

majority of the evidence against each defendant came from the

same witness, Ferguson's testimony was quite precise and the

Court's review of the record has revealed no instance where

Ferguson's statements regarding a particular defendant

prejudiced any other defendant.

Further, this is not a case, such as *Kotteakos*, involving

many separate conspiracies with many more defendants. Instead,

as in *Kemp*, there are at most three separate conspiracies

involving. There are only four conspirators, just three of whom

are defendants. Moreover, the Defendants' respective roles in

alleged conspiracy were outlined in considerable detail in the

Indictment. None of the Defendants has suggested that the

Indictment failed to put him on notice or is so vague it runs

the risk of prosecuting him twice for the same offense.

The Court thus finds that there is little risk of a

prejudicial spillover stemming from the admission of evidence

relating to one defendant against the others, or vice versa. The

Court further finds that whatever additional burden was imposed

by charging the defendants in a single conspiracy was minimal,

at best. Accordingly, the Court finds that, if there was indeed

an impermissible variance, the Defendants rights could not have

been substantially prejudiced. The Court will thus deny the

Defendants' motion for a new trial.[1]

    An appropriate order follows.

S\_____

**CURTIS V. GÓMEZ**
**Chief Judge**

---

[1] Having found that no prejudice could have befallen them in any event, the Court expresses no opinion as to whether or not there was an impermissible variance.